UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MILBY, *ET AL.*                                                                                   Plaintiffs

v.                                                                          Civil Action No. 3:23-cv-49-RGJ

UNDERWOOD, *ET AL.*                                                                              Defendants

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Stephany Milby, Chastity Milby, and Katie Aubrey (collectively, "Plaintiffs") filed a complaint against Defendants Jamie Underwood, Gary Huffines, Steven Grant, Jason Jones, Jacob Duvall, David Bandy, Jr., Rita Skeeters, Amber Slayton, and West Kentucky Correctional Healthcare, LLC ("WKCH") (collectively, "Defendants"). [DE 4]. WKCH moved to dismiss all claims against it. [DE 7]. Plaintiffs responded and WKCH replied. [DE 9; DE 10]. Accordingly, WKCH's motion is ripe for adjudication. For the reasons stated below, WKCH's motion is **GRANTED** in part and **DENIED** in part.

**I.    Background**

Plaintiffs' complaint stems from the death of Dalton Milby ("Milby") on or about February 12, 2022 at the Larue County Detention Center ("LCDC"). [DE 4 at 58]. Milby died by suicide. [*Id.*; DE 7-1 at 82]. The complaint alleges the following counts against WKCH: (1) negligence, (2) negligence *per se*, (3) wrongful death, (4) loss of parental consortium, (5) a § 1983 *Monell* claim for "policies or customs of inadequate medical care [and] inadequate conditions of confinement in violation of the Eighth and Fourteenth Amendment," and (6) a § 1983 *Monell* claim for "failure to adequately train officers in violation of 42 U.S.C. § 1983." [DE 4 at 62–72].

Defendant Jamie Underwood was the jailer at LCDC. [*Id.* at 56]. The remaining individuals named in the complaint were jail officers employed by LCDC. [*Id.*].

Plaintiffs allege that Milby "exhibited suicidal tendencies" before his death in addition to informing Defendants that he had recently attempted suicide. [*Id.* at 59]. They assert that Milby was first given an anti-suicide smock because of these warning signs, but that this smock was replaced with a standard jumpsuit soon after. [*Id.* at 60]. Plaintiffs maintain that Defendants' failure to ensure Milby had adequate medical care and to implement proper policies and procedures directly contributed to Milby's death. [*Id.* at 60–62].

## II.    Discussion

To begin, Plaintiffs argue that Kentucky's notice pleading standard applies. [DE 9 at 97 ("Kentucky is a notice pleading jurisdiction, where the central purpose of pleadings remains notice of claims and defenses."), 101 ("Plaintiffs have put forth sufficient facts to support the claims being made against [WKCH] and to satisfy the notice pleading requirement[.]")]. That is incorrect. This action was filed directly in federal court. [DE 1; DE 4]. This Court has federal question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a). Accordingly, the Federal Rules of Civil Procedure apply to all claims. *Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.*, 757 F.3d 540, 546 (6th Cir. 2014) ("The general rule, of course, is that the Federal Rules of Civil Procedure . . . apply to all civil cases brought in federal courts.") (citing *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (holding that the "Federal Rules of Civil Procedure are the rules of practice which apply to civil actions in the federal courts, regardless of whether jurisdiction is based on federal question or diversity of citizenship")).

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).  When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party.  *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted).  "But the district court need not accept a bare assertion of legal conclusions."  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citation and quotations omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotations omitted).

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "A complaint will be dismissed . . . if no law supports the claim[s] made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief."  *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

### A. Negligence Claims

WKCH argues that both the negligence and negligence *per se* claims against it should be dismissed because Plaintiffs "failed to file a certificate of merit with the Amended Complaint"

3

which "failed to satisfy the requirements of KRS 411.167(1)." [DE 7-1 at 84]. WKCH also argues that the negligence *per se* claim should be dismissed because 501 KAR 3:060—the statute it is based on— "only applies to the jailer and his employees." [*Id.* at 85]. These are the only grounds asserted in the motion at issue.

### i. Certificate of Merit for Common Law Negligence Claim

WKCH cites *Cleaver v. S. Health Partners, Inc.*, No. 3:21-CV-747-BJB-CHL, 2022 WL 1620626 (W.D. Ky. May 23, 2022) and *Dumphord v. Gabriel*, No. CV 5:20-461-DCR, 2021 WL 3572658 (E.D. Ky. Aug. 12, 2021) for the proposition that Plaintiffs' "claims against WKCH, which are grounded in medical negligence, must be dismissed in their entirety" because they are not accompanied by a certificate of merit. [DE 7-1 at 84–85 (citing *Dumphord*, 2021 WL 3572658, at *1)]. But, as Plaintiffs correctly point out, those cases are different. [DE 9 at 97]. Both *Cleaver* and *Dumphord* involved medical malpractice claims against *hospital* defendants, not healthcare providers operating within prisons or jails. So, while those cases held that a certificate of merit was required, the same reasoning does not apply because WKCH is not a hospital.

WKCH tries to fit Plaintiffs' negligence claims into the categories of KRS 411.167 that require a certificate of merit, arguing that negligence claims against an entity like WKCH are derivative of underlying medical malpractice claims. [DE 10 at 121 (citing *Lake Cumberland Reg'l Hosp., LLC v. Adams*, 536 S.W.3d 683, 691 (Ky. 2017))]. *Lake Cumberland* explains that "a claim of negligence against a hospital for the selection of its physicians is derivative of the medical malpractice claim against the physician," 536 S.W.3d at 691, but also acknowledges that it could "envision a scenario where a negligence action against a hospital would not be derivative of an action against a physician or employee." *Id.* at 691 n. 1. In other words, a claim against a hospital for harming a patient will often require demonstrating that a doctor or employee of that

4

hospital actually harmed that patient—but not always. Meanwhile, Plaintiffs argue the standard for a § 1983 action does not require a certificate of merit. [*See* DE 9 at 95 ("As long as these objective and subjective elements of deliberate indifference are met . . . the plaintiff need not present verifying medical evidence to show that . . . his medical condition worsened or deteriorated.") (citation omitted) (emphasis omitted)]. These discussions misidentify the issue.

The question is not whether the negligence claim against WKCH is derivative of the actions of its employees, as it arguably is, [*see* DE 4 at 63 (alleging WKCH is "liable for the actions or inactions of the Jail Officer Defendants and other employees . . . under the doctrine of *respondeat superior*")], and § 1983's standard is irrelevant to Plaintiffs' common law negligence claims. The relevant question is simply whether the negligence claims against WKCH are covered under the plain language of KRS 411.167. The United States District Court for the Eastern District of Kentucky recently analyzed a similar situation in which a jail was sued for (1) medical negligence and gross negligence and (2) negligent staffing. *See O'Hara v. Laurel Cnty. Corr. Ctr.*, No. 6:23-CV-026-CHB, 2023 WL 5729212, at *4–*5 (E.D. Ky. Sept. 5, 2023). Applying the plain language of KRS 411.167, the court in that case was "not convinced that a Certificate of Merit" was required. *Id.* at *4 (citing *Barnett v. Central Ky. Hauling, LLC*, 617 S.W.3d 339, 341–42 (Ky. 2021)). It found that the defendant was "not a hospital licensed pursuant to KRS Chapter 216," that a jailer was "not a physician, surgeon, dentist, or hospital," and even "question[ed]" whether a certificate was required for a medical negligence claim against a nurse employed by the jail. *Id.* at *5 (citations and quotations omitted).

Because KRS 411.167(1) is unambiguous, the Court applies the ordinary meaning of the text. *See Lee v. Haney*, 517 S.W.3d 500, 503–04 (Ky. App. 2017) ("A fundamental canon of statutory [and regulatory] construction is that, unless otherwise defined, words will be interpreted

5

as taking their ordinary, contemporary, common meaning.") (quoting *Rosen v. Commonwealth, Pub. Prot. Cabinet, Dept. of Fin. Inst.*, 451 S.W.3d 669, 674 (Ky. App. 2014)) (brackets in original); *Stewart v. Estate of Cooper*, 102 S.W.3d 913, 915–16 (Ky. 2003) ("Where there is no ambiguity in a statute, there is no need to resort to the rules of statutory construction in interpreting it. The words of the statute are simply accorded their commonly understood meaning.") (quoting *Reg'l Jail Authority v. Tackett*, 770 S.W.2d 225, 229 (Ky. 1989)). WKCH may employ a physician, [DE 10 at 122], but Plaintiffs allege no claims against a physician. All of Plaintiffs' claims are against either WKCH directly or against the jailer or LCDC's employees that Plaintiffs refer to as "jail officers." [DE 4 at 56]. Just like the defendants in *O'Hara*, neither the jailer nor the jail officers are a "physician, surgeon, [or] dentist" and WKCH is neither a "hospital licensed pursuant to KRS Chapter 216" nor a long-term-care facility as defined in KRS 216.510. KRS 413.140(1)(e). Claims against physicians, surgeons, dentists, hospitals,[1] or long-term care facilities are the only enumerated entities for which KRS 411.167(1) requires a certificate of merit.

Because none of the named defendants are a "physician, surgeon, dentist or hospital" under KRS 413.140(e), KRS 411.167 does not require a certificate of merit. Therefore, WKCH's motion to dismiss Count I is **DENIED**.

---

[1] In its reply, WKCH discusses *Mattingly v. Jewish Hosp.*, No. 2021-CA-1353-MR, 2023 WL 128660 (Ky. Ct. App. Jan. 6, 2023), where the defendant argued that physical therapists were not enumerated in KRS 413.140(1)(e). [DE 10 at 122]. The court in *Mattingly* declined to dismiss the case because the physical therapist defendant was employed by a hospital, which *is* an enumerated entity in KRS 413.140(1)(e). *Mattingly*, 2023 WL 128660, at *1–*2. Thus, *Mattingly* leaves WKCH with the same problem—it is not a hospital. For what it is worth, *Mattingly* did discuss the definition of a hospital, *Id.* at *2, and there may be some similarities between WKCH and a hospital. But a hospital is defined by KRS 216.1920 as "a facility licensed pursuant to KRS Chapter 216B as either an acute-care hospital, psychiatric hospital, rehabilitation hospital, or chemical dependency treatment facility[.]" These terms do not describe WKCH (or a correctional facility more generally), and so it cannot be considered a "hospital" for the purposes of KRS 411.167, even if it employs a physician and provides medical care.

      ii.      **Negligence *Per Se***

WKCH argues that because 501 KAR 3.060 "only applies to the jailer," Plaintiffs' negligence *per se* claim must be dismissed. [DE 7-1 at 85]. It is true that parts of this regulation only apply to the jailer, such as "Section 1: Policy and Procedure" which requires that "[t]he jailer or jail administrator shall develop a written policy and procedure governing the security aspects of the jail's operation." 501 KAR 3.060. But other sections—such as "Section 2: Prisoner Supervision"—apply to "[j]ail personnel" more generally. *Id.* Still, as WKCH points out, Plaintiffs do not name any personnel of WKCH who allegedly violated any part of 501 KAR 3.060, and they do not explain why any employees of WKCH would be responsible for meeting the requirements of 501 KAR 3.060, which specifically assigns prisoner supervision responsibilities to "jail personnel," not to contracted healthcare providers. [DE 7-1 at 85 ("the [complaint] does not even identify WKCH employees or allege WKCH employees were working during the relevant time period")].

Plaintiffs respond that WKCH "admits that they are suable under § 1983" and that WKCH's contract required it to abide by 501 KAR 3.060. [DE 9 at 98]. That WKCH is suable under § 1983 has nothing to do with a negligence *per se* claim, and the Court finds no language in the contract that would give rise to a negligence *per se* claim against WKCH under 501 KAR 3.060. No language in the contract explicitly delegates any sort of responsibility for LCDC's

regular supervisory requirements to WKCH.[2] [*See* DE 9-1]. As a result, 501 KAR 3.060 cannot form the basis for a negligence *per se* claim. WKCH's motion to dismiss Count II against it is **GRANTED**.

### B. § 1983 *Monell* Claims

WKCH argues that Plaintiffs' *Monell* claims should be dismissed for failure to state a claim[3] because they do not "assert *any one* of WKCH's employees violated Mr. Milby's constitutional rights" and "exclusively target jail personnel and their institutional responsibilities." [DE 7-1 at 86–87 (emphasis in original)]. WKCH bases this argument largely on *D'Ambrosio v. Marino*, [*Id.* at 86], which it quotes for the proposition that WKCH is "liable under § 1983 only if the challenged conduct occurs pursuant to [WKCH]'s 'official policy,' such that [WKCH]'s promulgation or adoption of the policy can be said to have 'cause[d]' one of its employees to violate the plaintiff's constitutional rights." 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)). Plaintiffs respond that (1) the "complaint is merely required to give a defendant fair notice and identify the claim" and (2) that the complaint makes a "myriad of factual allegations" to support its *Monell* claims. [DE 9 at

---

[2] The parties do not discuss it, but the complaint also alleges "Defendants owed a statutory duty of care to Mr. Milby and other inmates under 501 KAR 3:160 to ensure that all jail personnel receive a minimum of twenty-four (24) hours of annual in-service training." [DE 4 at 65]. 501 KAR 3:160 calls for 24 hours of annual in-service training for jail personnel, including at least four hours for mental health training within the first year (and then one hour each following year) focusing on "mental health triage or mental health services to the jail," and training focused on medical awareness. WKCH's contract also requires that "WKCH shall provide training each calendar quarter for Jail staff covering topics reasonably requested by the Jailer, coordinated in a manner and at times as determined between WKCH and the Jailer; the Jailer shall be responsible for mandating attendance and cooperation of the Jail staff as appropriate." [DE 9-1 at 106]. Thus, although WKCH agreed to provide training in its contract, the ultimate responsibility for making sure jail personnel were trained still fell to LCDC.

[3] Although WKCH is not a municipality, it acknowledges it is suable under § 1983 by virtue of its performance of a state function. [DE 7-1 at 86 (citing *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014) ("Private corporations that perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting under color of state law.") (citation and quotation marks omitted))].

98, 99]. As explained above, Plaintiffs' first argument is incorrect as a matter of law, so the Court only addresses the second argument by applying the federal standard for a 12(b)(6) motion.

Plaintiffs bring two separate § 1983 *Monell* claims in Count VI and Count VII. Because these claims involve different standards, the Court addresses each separately.

### i. § 1983: Policy or Custom

To state a § 1983 claim based on a municipal policy or custom, Plaintiffs must "identify the policy, connect the policy to [WKCH] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). A plaintiff generally has four ways to demonstrate an unlawful policy or custom: "[t]he plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). "Even after showing an unlawful policy or custom, a plaintiff must also demonstrate a direct causal link between the policy and the alleged constitutional violation in order to show that the municipality's deliberate conduct can be deemed the 'moving force' behind the violation." *Jones v. Louisville/Jefferson Cnty. Metro Gov't*, 482 F. Supp. 3d 584, 597 (W.D. Ky. 2020) (quoting *Spears*, 589 F.3d 249 at 256 (cleaned up)). "[P]roof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact." *Mann v. Helmig*, 289 Fed. App'x 845, 850 (6th Cir. 2008) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987)). At the motion to dismiss stage, it is sufficient for a plaintiff to plausibly allege an unlawful

policy or custom and a direct causal link to the harm. *Daugherty v. Louisville-Jefferson Cnty. Metro Gov't*, 495 F. Supp. 3d 513, 524 (W.D. Ky. 2020) (finding plaintiffs sufficiently stated a § 1983 claim based on a municipal policy or custom where "Plaintiffs allege[d] a specific policy of targeting African American males for traffic stops")).

While the complaint does not identify a specific source of a policy or custom designed by WKCH that contributed to Milby's death, it does allege facts that allow the Court to reasonably infer that one existed. The complaint alleges that Milby "told the Defendants that he had recently attempted suicide[,]" received an inadequate "degree of care" for his mental health concerns, and that WKCH was "responsible for" providing that care. [DE 4 at 58–61]. Perhaps most importantly, Plaintiffs allege that "Mr. Milby was originally placed in an anti-suicide smock . . . because his comments and behavior were indicative of suicidal tendencies," but at some later point, "Defendants provided Mr. Milby with a standard jumpsuit, in direct violation of known suicide prevention techniques, standards, policies and procedures." [*Id.* at 60]. Taking these factual allegations as true, the complaint identifies two main ways in which Defendants could have contributed to Milby's death after he informed him that he had recently attempted suicide: (1) failing to supervise or treat him, knowing he was at risk and (2) giving him a standard jumpsuit after he was originally given an anti-suicide smock.

Even with these allegations, whether Plaintiffs do enough to "identify the policy, [and] connect the policy to [WKCH] itself" is a close call. *Garner*, 8 F.3d at 364. The complaint alleges over and over that there is a policy or custom that led to inadequate medical care, which subsequently contributed to Milby's death, but the complaint never says exactly what WKCH's policy was. The complaint illustrates a culture where staff at LCDC knowingly disregarded policies about supervising and monitoring inmates, which could amount to "a custom of tolerance

10

or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256. But Underwood and the jail officers named worked for LCDC, not for WKCH. *See Gray v. City of Detroit*, 399 F.3d 612 (6th Cir. 2005) (holding that a duty "to provide adequate *medical* care . . . is readily distinguishable from the more narrow duty to try to prevent foreseeable suicides") (emphasis in original). The complaint routinely lumps all parties together as Defendants, so it is difficult to know exactly what involvement WKCH did or did not have in Milby's death. *See Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 489 (6th Cir. 2020) ("If the plaintiff fails to establish a constitutional violation by any individual officer, the municipality itself cannot be held liable under § 1983") (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)).

But the Court is required not only to presume all alleged facts are true, but also to draw all reasonable inferences in favor of Plaintiffs. The Court can deduce that someone—whether it was WKCH or staff employed by LCDC—swapped Milby's anti-suicide smock for a standard jumpsuit, and it is possible that inadequate monitoring contributed to Milby's death as well. *See Gray*, 399 F.3d at 618 ("As applied to suicide claims, the case law imposes a duty on the part of municipalities to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable."). While Plaintiffs have arguably not shown enough to demonstrate WKCH was responsible for supervising Milby, it is reasonable to infer that they would have known about the alleged decision to exchange the anti-suicide smock for a standard jumpsuit, and they were certainly responsible for treating known mental health risks. Taking the factual allegations of the complaint as true— that Milby told Defendants (to include WKCH) that he had recently attempted suicide, and that Milby was given an anti-suicide smock before being given a standard jumpsuit at a later point—it is plausible that WKCH, as LCDC's contracted medical provider, was at least aware of that decision. WKCH's contract with LCDC required a WKCH nurse to be "onsite" forty hours per

11

week and eight weekends, along with "24/7 on call phone or video streaming service to an MD, NP, or PA[.]" [DE 9-1 at 105]. The complaint does not specify which individual(s) Milby told that he had recently attempted suicide, but it is reasonable to infer that WKCH would have been privy to this information because suicidal ideation is a serious medical need. *See Troutman*, 979 F.3d at 482 (explaining that "[p]sychological needs may constitute such 'serious medical needs' particularly when those psychological needs 'result in suicidal tendencies'" and "'prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner.'") (quoting *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994) and *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). Given WKCH's position as a medical provider, allowing Milby's anti-suicide smock to be exchanged for a standard jumpsuit could demonstrate a "custom of tolerance or acquiescence of federal rights violations" or a "policy of inadequate training or supervision" for its own staff. *Spears*, 589 F.3d at 256. Because this scenario is "plausible" on the face of the complaint, *Twombly*, 550 U.S. at 570, the motion to dismiss Plaintiffs' § 1983 *Monell* claim under Count VI is **DENIED**.

### ii.   § 1983: Failure to Train or Supervise

To state a § 1983 claim based on a municipality's failure-to-train or failure-to-supervise, the plaintiff must allege: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). As to the municipality's "deliberate indifference," the plaintiff must either allege: (1) "prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury"; or (2) "[A] single

violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation[.]" *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005); *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997).

According to the complaint, "Defendants had a legal duty to adequately train and supervise jail personnel and/or those under contract with LCDC in the administration of health care policies related to the care and treatment of inmates, among other policies affecting inmate rights." [DE 4 at 61]. It is true that WKCH's contract with LCDC required WKCH to "provide training each calendar quarter for [LCDC] staff covering topics reasonably requested by the Jailer, coordinated in a manner and at times as determined between WKCH and the Jailer," although "the Jailer" was still "responsible for mandating attendance and cooperation of [LCDC] staff as appropriate." [DE 9-1 at 106]. At the very least then, Plaintiffs have shown that WKCH took on some responsibility for training LCDC staff. Certainly, WKCH was responsible for training its own staff.

Plaintiffs assert that "[s]erious, unaddressed injuries and medical conditions occur again and again at LCDC as a result of the failures to properly observe detainees/inmates, report their medical issues, and/or properly address the serious medical issues" and that "[t]here has been an unreasonable and excessive number of instances in which the mental health and medical needs of incarcerated individuals within LCDC have been ignored, mental health/medical requests have been denied, and in which observations and mental health/medical care has been inadequate." [DE 4 at 69, 71]. However, Plaintiffs offer no supporting facts to explain what these injuries were, who they happened to, or when they happened. Even so, Plaintiffs do allege sufficient facts to draw a reasonable inference of deliberate indifference on other grounds, because they allege that Milby directly informed Defendants (to include WKCH) that he had recently attempted suicide. Bearing

in mind that the complaint alleges he was then given a standard jump suit, that is exactly the type of situation when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989); *see also Gray*, 399 F.3d at 618 ("A municipality may be liable under § 1983 where the risks from its decision not to train its officers were 'so obvious' as to constitute deliberate indifference to the rights of its citizens."). Allowing employees to respond to direct knowledge that an inmate has recently attempted suicide by exchanging his anti-suicide smock for a standard jumpsuit is a plausible allegation that "the need for more or different training [was] so obvious" that it amounts to deliberate indifference. *Harris*, 489 U.S. at 390. Therefore, Plaintiffs allege sufficient facts to draw a reasonable inference that WKCH's "training or supervision was inadequate for the tasks performed[,]" *Ellis ex rel. Pendergrass*, 455 F.3d at 700, and that this amounted to deliberate indifference.[4] WKCH's motion to dismiss Plaintiffs' *Monell* claim under Count VII is **DENIED**.

### C. Wrongful Death and Lack of Consortium Claims

WKCH points the Court to the plain text of KRS 411.130 for the proposition that to successfully plead a wrongful death claim, the complaint "must have sufficiently alleged facts

---

[4] This is especially true here because the complaint alleges that Defendants had direct knowledge of Milby's suicide risk. *See Troutman*, 979 F.3d at 483 ("Demonstrating such knowledge is a 'high bar' and typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm.") (quoting *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020)); *see also Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013) ("[I]t is not enough to establish that an official may have acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide; the test is a *strong likelihood* of suicide . . . because a finding of deliberate indifference requires a sufficiently culpable state of mind[.]") (emphasis in original). Here, the complaint alleges that Milby directly informed Defendants that he had attempted suicide recently. [DE 4 at 60].

illustrating WKCH negligently or wrongfully inflicted Mr. Milby's alleged constitutional violations." [DE 7 at 87]. That statute reads as follows:

> Whenever the death of a person results from an injury inflicted by the *negligence or wrongful act* of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. If the act was willful or the negligence gross, punitive damages may be recovered. The action shall be prosecuted by the personal representative of the deceased.

[DE 7 at 87 (quoting KRS 411.130) (emphasis added)]. WKCH's reading is not quite right—the statute only requires that the person's death result from either (1) negligence or (2) a wrongful act. These do not require a constitutional violation, and because the Court has not dismissed Plaintiffs' negligence claim or § 1983 *Monell* claims against WKCH, it cannot dismiss Plaintiffs' wrongful death claim.

Accordingly, Plaintiffs' loss of consortium claim must also survive. WKCH is correct that this claim depends on a wrongful death claim. [DE 4 at 7]; *Owens v. Glob. Equip. Co., Inc.*, No. 1:17-CV-00182-GNS, 2018 WL 3186980, at *1 (W.D. Ky. June 28, 2018) (explaining that "loss of parental consortium is only recoverable in wrongful death actions") (citing *Lambert v. Franklin Real Est. Co.*, 37 S.W.3d 770, 780 (Ky. App. 2000)). Because Plaintiffs' wrongful death claim survives, so too does their loss of consortium claim. WKCH's motion to dismiss Count IV and Count V against it is **DENIED**.

### III. Conclusion

For the reasons explained, and the Court being otherwise sufficiently advised, WKCH's motion to dismiss is **GRANTED** in part and **DENIED** in part. Accordingly, it is **ORDERED** that:

1. Count II (negligence *per se*) is **DISMISSED** as against WKCH;
2. All other counts against WKCH remain.

January 29, 2024

Rebecca Grady Jennings, District Judge
United States District Court

cc: counsel of record