UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MILBY, *ET AL.*                                                    Plaintiffs

v.                                                    Civil Action No. 3:23-cv-49-RGJ

UNDERWOOD, *ET AL.*                                                Defendants

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Stephany Milby, Chastity Milby, and Katie Aubrey (collectively, "Plaintiffs") filed a complaint against Defendants Jamie Underwood ("Underwood"), Gary Huffines ("Huffines"), Steven Grant ("Grant"), Jason Jones[1] "(Jones"), Jacob Duvall ("Duvall"), David Bandy, Jr. ("Bandy"), Rita Skeeters ("Skeeters"), Amber Slayton ("Slayton"), and the West Kentucky Correctional Center ("WKCH") for claims arising out of the death of Dalton Milby ("Milby") while detained at the Larue County Detention Center ("LCDC").[2] [DE 4]. Underwood,

---

[1] Defendant Jones did not join the other Defendants in moving for summary judgment. The Court is aware that Plaintiffs had trouble locating and serving Jones. On May 9, 2023, Plaintiffs moved for an extension of time to serve Jones. [DE 12]. Plaintiffs noted that they originally issued summons to Mr. R. Keith Bond ("Bond"), counsel for Defendants, after being made aware that Bond would represent all LCDC Defendants, including former LCDC employee Jones. [*Id.* at 139]. Bond later notified Plaintiffs that he had spoken with Jones, who refused to allow Bond to accept service on his behalf. [*Id.* at 140]. Plaintiffs thereafter hired a process server to locate and serve Jones, but she was unable to locate him. Accordingly, the Court granted Plaintiffs a 90-day extension. [DE 13].

On February 15, 2024, Plaintiffs filed a motion for appointment of a warning order attorney to determine Jones's whereabouts and represent his interests. [DE 25]. The Court granted Plaintiffs' motion, issued a warning order directing Jones to appear within 50 days of the order, and appointed Elizabeth M. Dodd ("Dodd") as the warning order attorney. [DE 28]. On May 22, 2024, Dodd filed a report stating that she had located an address for Jones and sent a verified letter to that address on April 11, 2024 informing Jones of this lawsuit. [DE 35]. Dodd stated that UPS tracking confirmed delivery of the letter. [*Id.*]. The Court then discharged Dodd and awarded her attorney fees on May 28, 2024. [DE 40]. Since then, Jones has not appeared, and the Court has not been made aware of any additional development regarding his service.

[2] Defendants Duvall and WKCH have been dismissed from this case. [DE 103; DE 105]. As a result, the Court will not address claims brought against those Defendants. Furthermore, the motions for summary judgment filed by Duvall and WKCH [DE 85; DE 86] will be denied as moot.

1

Huffines, Grant, Bandy, Skeeters, and Slayton move for summary judgment with respect to all of Plaintiffs' claims against them. [DE 83]. Underwood, Huffines, Grant, Jones, Skeeters, and Slayton move to exclude the testimony of Plaintiffs' expert.[3] [DE 82]. Plaintiffs have responded to both motions [DE 88; DE 91], and Defendants have replied [DE 90; DE 132]. Briefing is complete and the matter is ripe. For the reasons below, the Court **DENIES** Defendants' motion to exclude expert testimony [DE 82], and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment [DE 83].

## I.    BACKGROUND

This case stems from the tragic death by suicide of Milby on February 12, 2022, while he was detained at LCDC. Milby was arrested on February 11, 2022 on charges of menacing after an altercation at his parents' home. [DE 91 at 875]. He was taken to LCDC, where he was put on suicide watch and issued an anti-suicide smock. Despite this, Milby managed to gain access to a standard jail jumpsuit, which he used to take his own life shortly before 4:00 p.m.

A.  Parties involved

On the day of Milby's death, four LCDC deputies were on duty: Huffines, Grant, Duvall, and Skeeters. [DE 84 at 498]. Each deputy was responsible for different assigned duties during their shift. Huffines was the shift supervisor on duty and was responsible for monitoring detainees in the "county side" section of the jail, where Milby was housed. [DE 132 at 1998; DE 120-1, Huffines Dep. at 1773]. As part of his duties, Huffines was required to perform rounds, whereby

---

[3] These motions are brought by two slightly different groups of Defendants. Throughout this opinion, the Court will refer to both groups as "Defendants."

he would routinely check on inmates. [DE 120, Huffines Dep., at 1763]. [4]  For inmates on suicide

watch, Huffines was required to conduct rounds every fifteen minutes, pursuant to LCDC policy.[5]

[*Id.* at 1764]. Grant was responsible for monitoring detainees and conducting rounds on the "state

side" of the LCDC. [DE 122, Grant Dep., at 1835]. While Grant had no duty to conduct rounds on

the county side, he would walk to the county side to check on Huffines and ask if he needed help.

[*Id.*]. Duvall was a new employee who had only been working at the jail for two days, and who

was shadowing Huffines.[6] [DE 84 at 498; DE 118, Duvall Dep. at 1696]. Skeeters, meanwhile,

operated the control room, where she was responsible for monitoring surveillance cameras and

opening secured doors. [DE 84 at 498; DE 119, Skeeters Dep. at 1725]. Bandy, another control

room worker, was not working at the time of Milby's incarceration and thus was not present at

LCDC. [DE 123, Bandy Dep., at 1857–88].

Underwood, the LaRue County Jailer at the time of Milby's death, was responsible for

supervising the other defendants in this case—Huffines, Grant, Duvall, Skeeters, Slayton, and

Bandy. [DE 121, Underwood Dep., at 1792–93]. Underwood was not present at LCDC during the

period of Milby's detention, but he indicated that he was "in charge" and "on call" even when not

present at the jail. [*Id.* at 1799].

Slayton, an LCDC floor deputy who worked the night shift, was on duty the night that

Milby was first brought to LCDC. [DE 117, Slayton Dep., at 1671–72]. Slayton was responsible

---

[4] This document and other full depositions were not filed as attachments to the parties' summary judgment briefing but were filed separately in preparation for trial. In their summary judgment briefing, the parties attached limited and disjointed portions of the depositions, from which the Court cannot fully discern context and meaning. Accordingly, to better understand the deposition testimony, the Court looks to the full depositions filed by Plaintiffs.

[5] 501 KAR 3:060 Section 2 mandates direct in-person surveillance every 20 minutes for inmates at risk of suicide. LCDC's policy, VI-100, imposed a more stringent requirement of 15-minute direct observations for suicide watch inmates. [DE 90-1, Carter Report, at 845–46].

[6] An agreed order of dismissal with respect to Defendant Duvall was entered on March 25, 2026, so he is no longer a party to this case.

for booking Milby into the detention center and conducting his initial intake questionnaire. [*Id.* at 1672]. Throughout the booking process, she was accompanied by Jones, another floor deputy on duty at that time. [*Id.*]. Slayton and Jones both conducted rounds and checked on Milby throughout the night. [*Id.* at 1675]. They left the jail at the end of the night shift and were not present at the time of Milby's suicide. [*Id.* at 1677].

    B.  <u>The Incident</u>

After Milby's arrest on February 11, he was taken to LCDC, where Slayton screened him with standard interview questions around 11:00 pm. [DE 117, Slayton Dep., at 1672]. At the screening, Milby revealed that he had attempted suicide in the past six months and that he had bipolar disorder. [*Id.* at 1673; DE 91-15]. Because of this, Slayton identified Milby as a high-suicide-risk inmate and contacted the jail triage service to conduct a mental health evaluation. [*Id.* at 1679]. The triage service identified Milby as being at a high risk for suicide and recommended that he be re-triaged in twelve hours. [DE 86-9]. Following assessment by the triage service, Milby was placed on suicide watch, provided an anti-suicide smock, or "turtle suit," and housed in a cell designed to prevent self-harm. [DE 83-8, Carter Report, at 400–01; DE 117, Slayton Dep., at 1679]. These actions were taken pursuant to LCDC policy, which provides that any inmate under suicide observation must be placed in a cell without any items with which he could hang himself, including belts, shoelaces, sheets, and towels. [DE 83-8, Carter Report, at 407]. Throughout the night, Slayton performed checks on Milby, whereby she would "holler for him to get him to move and make a sound." [DE 117, Slayton Dep., at 1677]. At 7:00 am on February 12, Slayton's shift ended, and Huffines and Grant began the day shift. [DE 120, Huffines Dep., at 1763; DE 122, Grant Dep. at 1835].

During the day, Milby was permitted to leave his cell twice: first to call his mother and then to shower. [DE 120-1, Huffines Dep., at 1772]. On both occasions, Milby was accompanied by Huffines and Grant, and he was placed in a regular orange jumpsuit for transport. [*Id.*]. Huffines and Grant had both been made aware that Milby was on suicide watch. [DE 120, Huffines Dep., at 1764; DE 122, Grant Dep., at 1835]. Grant testified that Milby was "very verbally suicidal" and was "talking about wanting to end his life." [DE 122, Grant Dep., at 1836]. After Milby got out of the shower, Huffines asked him if everything was okay, to which Milby responded that he was fine. [DE 120-1, Huffines Dep. at 1776]. Huffines then returned Milby to his cell at approximately 15:25.[7] [DE 91-5, Camera 10 Video, at 15:24:53–15:25:00]. Milby changed out of the orange jumpsuit and returned it to Huffines, who placed the jumpsuit outside the cell, near the cell door.[8] [DE 120-1, Huffines Dep., at 1776]. Huffines reported that he and Grant "tried to keep [the jumpsuit] close to the cell in case [Milby's] mom calls, or pre-trial calls, or if we have to put [him] in a jumpsuit to take [him] to the phone," so that they would not have to "go all the way to the back to get one." [*Id.*]. Underwood likewise testified that it was common practice to leave a jumpsuit outside the cell for immediate access. [DE 121, Underwood Dep., at 1808]. Huffines stated that, after Milby's death, deputies no longer leave jumpsuits outside cells. [DE 120-1, Huffines Dep., at 1776].

Video surveillance footage reveals the series of events leading up to Milby's death. Camera 11 was positioned within Milby's cell, while camera 10 was positioned directly outside the cell, facing the hall and booking room across from the cell. The footage reveals that, shortly after

---

[7] The Court will, from this point forward, use 24-hour time notation to reflect what is used in video surveillance footage and throughout witness depositions.

[8] Huffines testified that, at this point, Milby "put the turtle suit back on." [DE 120-1, Huffines Dep., at 1776]. On video footage, however, Milby appeared to be naked from the time he was returned to his cell until the time he committed suicide. [DE 91-5, Camera 10 Video, at 15:24:50; DE 91-5 Camera 11 Video, at 15:50].

returning to his cell after showering, Milby began reaching through the "bean flap," an opening in the cell used to pass trays to detainees. [DE 91-5, Camera 10 Video, at 15:25:30; DE 121, Underwood Dep., at 1808]. At approximately 15:28, Milby could be seen on video touching the orange jumpsuit, attempting to pull it into his cell. [DE 91-5, Camera 10 Video, at 15:28:07–15:28:14]. He continued reaching through the bean flap and attempting to grab the jumpsuit for approximately the next sixteen minutes and finally succeeded at pulling the jumpsuit into his cell at roughly 15:45. [*Id.* at 15:44:50–15:44:57; DE 91-5, Camera 11 Video, at 15:45:00–15:45:19]. At 15:49:16, the jumpsuit could be seen in full view, being held by Milby, and beginning at 15:50:47, Milby could be seen constructing a noose out of the jumpsuit. [DE 91-5, Camera 11 Video, at 15:49:16, 15:50:47–15:51:15]. Beginning at approximately 15:55, Milby was visible in the bottom corner of the video, standing on a raised surface and manipulating the orange jumpsuit. [*Id.* at 15:54:55–15:56:10]. At approximately 16:08, Milby could be seen putting the noose around his neck. [*Id.* at 16:07:57–16:08:03]. At 16:08:16, Milby's hands could be seen splaying out as he hung himself. [*Id.* at 16:08:11]. From the time Milby secured the jumpsuit to the time he hung himself, the noose was clearly visible on camera 11 on several occasions. [*See id.* at 15:51:14, 15:54:19; 16:07:36]. Moreover, there were several stretches of time during which Milby could not be seen on camera 11 at all, including from approximately 15:26–15:49, when he was retrieving the jumpsuit from outside his cell.

Huffines found Milby hanging at approximately 16:42 and began emergency response measures but was unable to revive him. [DE 91-5, Camera 10 Video, at 16:42:40; Camera 11 Video, at 16:43:02]. Surveillance footage reveals that, from the time Milby returned to his cell after showering (approximately 15:24) to the time Huffines found him hanging (approximately 16:42), Huffines took the following actions:

- 15:25:50–15:45:12 – Huffines is sitting in the booking room across from Milby's cell. Throughout this time, Milby reaches through the bean flap on several occasions.

- 15:45:12 – Huffines claps his hands and stands up.

- 15:45:20 – Huffines walks to the log sheet next to Milby's cell and records an observation. Huffines does not appear to look into Milby's cell.

- 15:45:45–15:46:49 – Huffines leaves the room and departs the camera view, returning several seconds later with a new log sheet. After returning, he fills out the sheet and then begins to leave the room again. As he leaves, he glances toward Milby's cell at 15:46:47.

- 15:47:48 – Huffines reappears on camera and sits down in the booking room across from Milby's cell.

- 15:47:52–15:56:43 – Huffines is sitting in the booking room across from Milby's cell. He departs camera view at 15:56:43 without appearing to look at Milby's cell.

- 16:06:30 – Huffines once again appears on camera next to Milby's cell and fills out the log sheet. He does not appear to look toward Milby's cell at this time.

- 16:06:54 – Huffines makes a playful gesture toward Milby's cell. Milby is not visible in footage from his cell at the same time, suggesting that he is next to the door, just out of frame and visible to Huffines. [DE 91-5, Camera 11 Video, at 16:06:54].

- 16:20:00 – According to Huffines' written statement given to police, at this time, he "went to serve trays" and Milby "said something I could not understand." [DE 120-1, Huffines Dep., at 1780]. At this point, Milby had already hung himself.

- 16:23:47–16:24:05 – Huffines records another round on the log sheet next to Milby's cell and appears to glance into the cell.

- 16:25:15–16:26:21 – Huffines re-appears and sits in the booking from across from Milby's cell.

- 16:26:42–16:26:57 – Huffines records another check on the log sheet next to Milby's cell. He again glances into Milby's cell, appears to knock on the door, and then departs.

7

- 16:26:59 –16:42:31- Huffines is off camera. He re-appears at 16:42:32 and discovers Milby shortly thereafter.

[DE 91-5, Camera 10 Video].

Throughout Milby's detention at LCDC, Skeeters was responsible for monitoring sixty camera feeds in the control room, including cameras 10 and 11. [DE 119, Skeeters Dep., at 1726, 1730]. Skeeters was aware that Milby was on suicide watch. [*Id.* at 1730]. Though Skeeters was in the control room for the two hours leading up to Milby's death, she did not report any issues with his behavior or make any calls to floor staff to check on him. She testified that she did not recall seeing Milby constructing the noose or preparing to hang himself. [*Id.* at 119]. Bandy, another LCDC control room worker who was not on duty that day, testified that control room workers are trained to "always watch the camera" for inmates on suicide watch and to call a deputy to check the cell if the inmate is not visible on camera. [DE 123, Bandy Dep., at 1860].

After the incident, Underwood immediately reported to the detention center. [DE 121, Underwood Dep., at 1804]. By the time he arrived, local police and emergency services were responding. [*Id.*].

On January 30, 2023, Plaintiffs filed a complaint against Defendants alleging various state and federal claims. [DE 1]. Plaintiffs' amended complaint, filed on February 6, 2023, asserts the following causes of action: negligence against all Defendants (Count I); negligence *per se* against all Defendants (Count II); assault and battery against Jones and Grant (Count III); wrongful death against all Defendants (Count IV); loss of parental consortium against all Defendants (Count V); *Monell* liability for inadequate medical care and inadequate conditions of confinement against Underwood and WKCH (Count VI); and *Monell* liability for failure to train against Underwood and WKCH (Count VII). [DE 4].

8

## II.    MOTION TO EXCLUDE EXPERT TESTIMONY

Plaintiffs offer the opinion of Timothy J. Murray ("Murray") to help the jury understand standards of care applicable to high-risk inmates like Milby and whether LCDC officers complied with those standards. [*see* DE 88-3, Murray Report]. Murray worked at various levels of the New York State Department of Correctional Services ("NYSDOCS") for thirty-one years and has since served as a correctional consultant for nearly two decades. [DE 88-1, Murray CV]. His expert report opines as to the sufficiency of Underwood's supervision and training of jail staff and the failures of LCDC staff on the day of Milby's death. [DE 88-3, at 805–06]. Defendants move to exclude Murray's testimony. [DE 82]. They argue that he is unqualified "since he did not apply the Kentucky Jail Standards and Policies and Procedures of the [LCDC]," and that his opinion will not be helpful to the trier of fact because "he elected to ignore applicable standards." [*Id.* at 350].

A.  Standard

The admissibility of expert testimony is set forth in Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." 509 U.S. 579, 597 (1993); *see also Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted).

9

> Under Rule 702 of the Federal Rules of Evidence, a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements. First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue. Third, the testimony must be reliable.

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The Court must determine whether the witness is qualified to offer an opinion on the specific area of expertise. *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at *5 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").

> Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth. The weight of the expert's testimony must be for the trier of fact.

*Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with expert qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'" *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013), *adhered to on denial of reconsideration*, No. 5:09-CV-00121-TBR, 2013 WL 1878934 (W.D. Ky. May 3, 2013) (quoting *Daubert*, 509 U.S. at 597). To assess reliability, the court must consider "whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and

10

whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529. To assist with this determination, the Supreme Court in *Daubert* laid out several factors for the courts to consider. *Daubert*, 509 U.S. at 592–94. These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). The test of reliability is "flexible," and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1990) (citing *Daubert*, 509 U.S. at 593).

Courts have "stressed, [] that Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case . . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation") (internal citations omitted). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.*

B. Analysis

Defendants take issue with Murray's application of the American Correctional Association's ("ACA") standards to the facts of this case, as well as his reliance on his own experience in the New York corrections system in rendering an opinion. [DE 82 at 347]. They

11

maintain that the Kentucky Jail Standards constitute the applicable standards by which the Defendants in this case should be assessed, and that Murray's failure to apply those standards renders his opinions unreliable or unhelpful. [*Id.* at 348–50]. Defendants also take issue with Murray's qualifications, contending that "he is not sufficiently qualified" to offer an opinion on the actions of Kentucky jail deputies because he "did not apply the Kentucky Jail Standards and Policies and Procedures of the Larue County Detention Center" to this case. [*Id.* at 345]. In response, Plaintiffs note that Murray referenced the Kentucky Administrative Regulations in addition to the ACA standards, that his long history in corrections qualifies him to offer his opinion, and that his testimony will provide the jury with "a baseline of reasonably, professionally accepted correctional practices." [DE 88 at 747–51].

### 1. Qualification

Defendants' only argument that Murray is unqualified to opine as to the deficiency of the Defendants' conduct is that he did not apply the Kentucky Jail Standards in his analysis. [DE 82 at 345]. Defendants contend that Murray lacks an understanding of the "qualifications required to serve as a jailer in Kentucky,"' and that this makes him unqualified to offer testimony on whether Defendants complied with relevant standards. [DE 90 at 821]. While this argument goes more to the relevance and reliability of Murray's testimony, the Court will briefly address Murray's qualifications.

Murray's CV reveals that he worked in corrections in New York for over thirty years, serving at three separate correctional facilities. [DE 88-1 at 766–67]. His career culminated in his appointment as superintendent at the Gowanda Correctional Facility, a 1,750-bed facility. [*Id.* at 766]. Throughout his career, he was responsible for overseeing staff, managing emergency response, developing local policies and procedures, and overseeing mental health units. [*Id.* at

12

764–68]. As deputy superintendent at the Wende Correctional Facility, a maximum-security prison, he had direct oversight of a 32-bed mental health unit that provided both long-term and crisis care, as well as a 40-bed special needs unit for inmates with profound psychological disorders. [*Id.* at 767]. As deputy superintendent, he was the direct liaison with the office of mental health and would meet weekly with the director of mental health services. [DE 116, Murray Dep., at 1554]. Moreover, the various facilities he worked in contained isolation cells for individuals on suicide watch, and Murray was directly involved in the supervision of employees that oversaw suicide watch. [*Id.*]. He has also worked directly on drafting and implementing policies and procedures for correctional facilities. [*Id.* at 1552]. Murray therefore has direct knowledge of correctional policies and procedures and standards of care for high-risk inmates such as Milby, making him qualified to offer an opinion on the standard of care applicable in this case. He also has extensive experience managing jail personnel, making him qualified to offer his opinion on whether the Defendants met the standard of care.

Murray's academic background supplements his lengthy career in corrections. He possesses a Bachelor of Science in Education, a Master of Science in Education, and a Certificate of Advanced Study in Educational Administration, as well as specialized training from the United States Department of Justice and the American Correctional Association. [DE 88-1 at 768]. Moreover, since his retirement from NYSDOCS, Murray has been retained in over thirty cases to provide insight on correctional policies, training, and emergency response. [*Id.* at 770–72]. Murray's education, direct experience with corrections, and regular provision of consulting services on correctional practices provide a foundation for him to answer questions related to standards of care, training, supervision, and emergency response in detention centers. The Court therefore finds that he is qualified under Fed. R. Evid. 702.

13

*2. Relevance*

As discussed above, evidence is relevant if it assists the trier of fact in understanding the evidence or determining a material fact in question. *See Daubert*, 509 U.S. at 591–93. As the Sixth Circuit has explained, "[t]he relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017) (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196–97 (9th Cir. 2014)). "When there is a factual issue in dispute that expert testimony can clarify, there are limited grounds for rejecting the testimony of the expert witness." *Id.*

Defendants maintain that Murray did not review the LCDC policies and procedures or the Kentucky Jail Standards developed by the Kentucky Department of Corrections. [DE 82 at 347]. They purport that he based his opinion only on ACA standards, which "are not helpful to the jury in determining the standard of care applicable to LCDC employees." [DE 90 at 821]. In other words, Defendants believe that Murray "offer[s] opinions using inapplicable standards," so his testimony will not help the jury determine whether the Defendants complied with the applicable standards. [DE 82 at 350]. In response, Plaintiffs dispute Defendants' contention that Murray did not review and apply the Kentucky Jail Standards or the LCDC policies and note that his report specifically addresses the Kentucky Administrative Regulations related to mental health care for inmates. [DE 88 at 750]. They also maintain that Murray's reference to national standards does not "replace Kentucky law," but "provide[s] the jury with a baseline of reasonable, professionally accepted correctional practices." [*Id.* at 753].

Notably, Murray's report references both the Kentucky Administrative Regulations and the ACA standards of correctional operations. [DE 88-3, at 799]. The report explains that LCDC staff are bound by not only Kentucky legal standards, but also professional standards in the

14

industry. [*Id.*]. The report further explains the Kentucky regulations related to inmates on suicide watch and notes that operations within the facility "are governed by Kentucky Administrative Regulations[.]" [*Id.* at 801]. The report then opines that Defendant Underwood failed to comply with these requirements. [*Id.* at 801–04]. Moreover, in his deposition, Murray stated,

> I will tell you that somewhere in the document that I received, and it may be an oversight, that I reviewed Kentucky -- I forget the terminology now, but Kentucky standards, Kentucky policy and procedure, if you will. I reference some of them in my report. . . . So it's obvious if you read my report, that there's reference to Kentucky standards so that I didn't just pull them out of thin air. So it may be an oversight that I didn't list it [in the documents I reviewed].

[DE 116, Murray Dep., at 1553]. Accordingly, Murray testified that he reviewed and based his opinions on not only national standards of professional conduct, but the Kentucky Jail Standards set forth in Title 501 of the Kentucky Administrative Regulations.[9]

The jury will be tasked with determining several key issues related to the applicable standard of care and whether defendants complied with that standard of care. For example, to decide the negligence claim, the jury will be required to determine whether the defendants exercised reasonable care to prevent a known high-risk inmate from harming himself. *See Sudderth v. White*, 621 S.W.2d 33, 35 (Ky. App. 1981) ("[I]f a jailer knows or has reason to believe that a prisoner might do harm to himself, he has a duty to exercise reasonable care to assure that such harm does not occur."). To make this determination, the jury must understand what would constitute "reasonable care" in this situation. Murray will assist the jury with this inquiry by

---

[9] In Murray's deposition, Defendants' counsel suggested that Murray failed to reference the Kentucky Jail Standards in his report and that the Kentucky Administrative Regulations are distinct from the Kentucky Jail standards. [DE 116, Murray Dep., at 1558.]. Specifically, counsel stated that "[the Kentucky administrative regulations are] not Kentucky jail standards, they're totally two different things. If you're – if you're referencing KARs, that's not the Kentucky jail standards." [*Id.*]. However, the Court is not aware of any Kentucky jail standards separate from those established by the Kentucky Department of Corrections in Title 501 of the Kentucky Administrative Regulations, and Defendants have not presented those standards to the Court.

15

discussing the standard of care applicable for suicidal inmates, applying both the Kentucky Administrative Regulations and the ACA policies. Understanding the applicable standard will help the jury determine whether the Defendants deviated from that standard. Murray will also opine as to what constitutes appropriate staff training for dealing with high-risk inmates and whether staff at LCDC were sufficiently trained and supervised—both relevant to Plaintiffs' § 1983 claim that there was a policy of inadequate training or supervision at LCDC. [DE 88-3 at 802–03].

Even if Murray does apply national standards, this does not automatically render his opinion unhelpful to the jury. Murray stated that he applied the ACA standards because they constitute professional standards that are "generally accepted . . . across the country." [DE 116, Murray Dep., at 1569]. Understanding generally accepted correctional practices will help the trier of fact determine what constitutes reasonable conduct by jail workers dealing with a suicidal inmate. *See Bryant v. Hensley*, No. CV 0:22-018-DCR, 2023 WL 3743571, at *5 (E.D. Ky. May 31, 2023), *aff'd*, No. 23-5608, 2024 WL 1180440 (6th Cir. Mar. 19, 2024) ("[E]xpert opinions regarding industry or institutional practices are generally admissible."). Defendants do not point to any differences between the Kentucky standard of care and the national standard of care that would render testimony about the national standard of care entirely unhelpful to the jury. Furthermore, expert opinions that rely in part on national professional standards such as this are regularly found to be relevant. *See, e.g., Poore v. Glanz*, No. 11-CV-797-JED-TLW, 2014 WL 4263225, at *4 (N.D. Okla. Aug. 29, 2014) (finding that expert's opinions, based in part on ACA standards, were "helpful to a prospective jury because they may assist the jury in understanding relevant standards in the corrections industry and how sexual assault prevention is, and can be, implemented in jails such as the Tulsa County Jail"); *Myers v. Taylor*, No. 1:14CV156, 2015 WL 12763630, at *6 (N.D. W. Va. June 24, 2015) (permitting expert testimony that police officers

16

"complied with national training and operational guidelines and best practices"). Murray's testimony therefore exceeds the low bar for relevancy.

### 3. Reliability

To assess reliability, the court must consider "whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529. In preparing his report, Murray reviewed numerous documents, including camera footage, depositions, Milby's hospital and arrest records, the LCDC website, the ACA standards, and more. [DE 88-3 at 808]. Defendants maintain that Murray fails to apply the principles and methods to the facts of this case because "he did not apply the applicable standard (Kentucky's) to the events of February 11-12, 2022." [DE 82 at 349]. In other words, Defendants once again argue that Murray's failure to apply Kentucky standards references his opinion unreliable. As the Court has already explained, however, Murray does reference the Kentucky standards in his report, and he testified that he reviewed the regulations in creating his report.

Nor do Defendants explain why Murray's reference to the ACA standards constitute an unreliable principle or method. They simply argue that Murray's testimony amounts to "his belief as to what should have been done in an ACA accredited facility, not a Kentucky facility governed by the Kentucky Jail Standards and the Policies and Procedures of LCDC." [DE 82 at 350]. Once again, Defendants point to no substantive differences between the ACA standard and the Kentucky standard such that the ACA standard would constitute an "unreliable" standard as applied to a Kentucky jail. Murray relies on the ACA, Kentucky regulations, and his own personal experience in corrections to provide an opinion on the appropriate standard of care. He compares the actions

17

of Defendants against that standard using facts he ascertained from depositions and camera footage. He therefore explains the "how" and "why" he reached his conclusions. *See Gaines v. Cnty. of Wayne*, No. 20-11186, 2022 WL 2758523, at *3 (E.D. Mich. July 14, 2022). This mirrors the approach used by jail practices experts in other cases. *See, e.g.*, *Rose v. Sevier Cnty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *6 (E.D. Tenn. Dec. 11, 2012) ("[The expert] may testify . . . whether in his opinion the defendants' alleged conduct was contrary to appropriate jail administration and/or standard correctional procedures, and whether in his opinion the alleged actions of the defendants violated jail policy or procedure."); *Bryant*, 2023 WL 3743571, at *5 (rejecting argument that expert's testimony was not reliable because it was "based on common sense rather than professional standards," and explaining that "opinions regarding industry or institutional practices are generally admissible"). Under the flexible approach used to determine reliability, the Court finds that this approach is reliable.

The Court therefore finds that Murray's expert opinion is admissible under the standards set forth in Federal Rule of Evidence 702 and *Daubert*.[10] As a result, the Court **DENIES** Defendants' motion to exclude expert testimony. [DE 82].

### III.     MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment with respect to all of Plaintiffs' claims against them. Because Defendants contend that summary judgment is proper with respect to Plaintiffs'

---

[10] In their reply, Defendants argue for the first time that even if Murray's testimony is found to be relevant, it should nonetheless be excluded under Federal Rule of Evidence 403 because its probative value is substantially outweighed by the danger of unfair prejudice. [DE 90 at 826]. Generally speaking, arguments raised for the first time in reply briefs are deemed waived. *See Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008) ("Generally, this Court has found that an issue raised for the first time in a reply to a response brief in the district court is waived."); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."). The Court will therefore not consider this argument, to which Plaintiffs have not had an opportunity to respond.

federal claims and further suggest that this Court should decline to exercise supplemental jurisdiction over any remaining state-law claims, the Court will first address Plaintiffs' federal causes of action. [*See* DE 84 at 500, 510 n.22].

A. Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion. *Id.* at 252.

The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must show a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. Pro. 56(c)(1)(A)–(B); *see also Shreve v. Franklin Cnty.*, 743 F.3d 126, 132 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby*, 477 U.S. at 252.

19

B. <u>Federal Law Claims (Counts VI and VII)</u>

Defendants move for summary judgment with respect to Plaintiffs' *Monell* claims asserted against Underwood, the LaRue County Jailer at the time of Milby's death. Defendants argue first that both Count VI and Count VII must be dismissed because they are asserted against Underwood in his individual capacity, and *Monell* imposes liability only against municipalities, not individuals. [DE 84 at 500]. Plaintiffs maintain that they intended to bring a *Monell* claim against Underwood in his official capacity, and while they request leave to file an amended complaint to reflect that, they did not attach an amended complaint to their request. [DE 91 at 910]. Plaintiffs also point to a series of actions taken by the other Defendants—including Huffines, Skeeters, and Slayton— and suggest that those actions give rise to § 1983 *Monell* liability for Underwood/LaRue County. [*Id.* at 881–90].

First, Plaintiffs misunderstand the nature of a *Monell* claim and the distinction between individual capacity and official capacity suits brought under 42 U.S.C § 1983. "Section 1983 creates a federal cause of action against state or local officials who deprive a person of a federal right while acting under the color of state law." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff may sue an official either in his individual capacity or official capacity. *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999). Official capacity claims, also referred to as *Monell* claims, are treated as claims against the municipality for which the defendant is an officer or agent. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *see also Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) ("An official-capacity claim against a person is essentially a claim against the municipality."); *Est. of Leeper v. CoreCivic, Inc.*, 797 F. Supp. 3d 797, 806 (M.D. Tenn. 2025) ("Both municipal liability and official capacity claims are often referred to as *Monell* claims."). In other words, § 1983 suits brought against an officer in his official capacity

20

"represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Graham*, 473 U.S. at 165 (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978)). A suit against a public official in his official capacity therefore imposes liability only on the government entity for which the officer is agent, provided that the government entity "received notice and an opportunity to respond." *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985).

Because the "real party in interest" in an official capacity claim is "the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotation marks omitted) (quoting *Graham*, 473 U.S. at 166)). Accordingly, to establish liability under § 1983 in an official capacity action, the plaintiff must show that the government's *official policy or custom* caused the alleged injury. *Monell*, 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). In other words, a plaintiff may only hold a municipal entity liable under § 1983 for the municipality's *own* wrongdoing, not under a theory of *respondeat superior* for injuries inflicted solely by the municipality's employees or agents. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of respondeat superior."); *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014).

Suits against officials in their individual capacity, on the other hand, "seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer*, 502 U.S. at 25. Thus, unlike in official capacity actions, "to establish *personal* liability in a § 1983

21

action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166. Individual and official capacity suits therefore have distinct requirements. To succeed on an official capacity (*Monell*) claim, a plaintiff must show an official government policy or custom that led to the constitutional violation. To succeed on an individual capacity suit, a plaintiff must only show that the conduct of the individual officer caused the constitutional violation.

Here, Plaintiffs' amended complaint specifies that Underwood is being sued in his individual capacity. [DE 4 at 57]. This suggests that Plaintiffs intended to sue Underwood personally for his own alleged constitutional violations. However, the only § 1983 causes of action brought by Plaintiffs are for purported "*Monell* violations," which, by definition, are claims brought against a government entity. [*Id.* at 67, 70]. In response to the motion for summary judgment, plaintiffs maintain that this was a pleading error and that they intended to sue Underwood in his official capacity. [DE 91 at 911]. Plaintiffs point to the fact that the amended complaint alleges that official policies and customs led to the constitutional violations, so it should be obvious that they intended to sue Underwood in his official capacity. [*Id.* at 912]. There are several problems with this argument, however.

First, Plaintiffs did not name LaRue County as a defendant, so it is not obvious that the County had notice or an opportunity to respond to this suit. *See Brandon*, 469 U.S. at 471–72 (explaining that an official capacity § 1983 suit only imposes liability on a government entity if that entity "received notice and an opportunity to respond"). "[I]f a claimant seeks damages from a municipality, this should be done by making it a named party defendant; that will assure the municipality has notice and an opportunity to respond." *Id.* at 879 (Burger, C.J., concurring).

22

Second, even if the Court proceeds as Plaintiffs request and construes their § 1983 claims as official capacity claims against the County, Plaintiffs fail to point to an official County policy or custom that led to the alleged constitutional violations. Rather, Plaintiffs contend that the individual officers on duty that day failed to comply with existing policies. In fact, at several points throughout their response, Plaintiffs concede the existence of suitable official policies. For instance, Plaintiffs admit that "Defendants failed to conduct the mandatory direct observations required by the Kentucky Administrative Regulations (every twenty minutes) and LCDC's own more stringent policies (every fifteen minutes)." [DE 91 at 876]. They further state that "[t]he record reveals a detention facility where suicide prevention policies existed on paper but were routinely disregarded in practice." [*Id.* at 880]. They point to LCDC Policy VIII-600, which "requires the removal of 'items with which [an inmate] could hang himself/herself (i.e., belts, shoelaces, sheets, towels, etc.)' from cells of inmates on suicide watch," and maintain that officers failed to comply with the policy. [*Id.* at 886]. They also note that "control room operators at LCDC were specifically trained that when a suicide watch inmate disappears from camera view, they must immediately call floor staff to check on the inmate." [*Id.* at 894–95]. Plaintiffs further recognize that

> "[t]he law in February 2022 clearly established that:
>
> - Jail officials must adequately monitor inmates known to be at substantial risk of suicide;
>
> - Hangable items must be removed from cells of suicidal inmates;
>
> - Observation requirements mandated by regulation and policy must be followed;
>
> - Failure to take these basic preventative measures when officials know of the risk constitutes deliberate indifference

23

[*Id.* at 896]. Finally, they indicate that the individual Defendants failed "to follow 501 KAR 3:070, which requires that 'inmates who have attempted suicide will be referred to local mental health agency.'" [*Id.* at 907]. Accordingly, the crux of Plaintiffs' argument is that appropriate policies *were* in place, but that individual officers failed to follow those policies. Evidence establishing that individual officers failed to fulfill their duties does not amount to evidence that the county had a policy or custom of failing to properly supervise high-risk inmates. *See Perez v. Oakland Cnty.*, 466 F.3d 416, 432 (6th Cir. 2006) (explaining that a caseworker's failure to follow county policy, resulting in the suicide of a detainee, suggested "a lack of a link between County policy and [the detainee's] suicide" because if the policy had been followed, the suicide could have been prevented); *see also Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 491 (6th Cir. 2020).

The law is clear that a municipality can be held liable for constitutional injuries "only for its own wrongdoing, not the wrongdoings of its employees." *Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 565 (6th Cir. 2018); *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015). Nor can a municipality or city be automatically liable simply because "one of its employees happened to apply the policy in an unconstitutional manner." *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). Rather, "a plaintiff must show that 'through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (internal quotation marks omitted) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)). To do this, a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). There are generally four avenues a plaintiff can take to prove an illegal policy or custom: "(1) the existence of an illegal official policy or

24

legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). As detailed below, Plaintiffs fail to point to evidence that would support any of these four theories of liability for the County.

    1.  *Count VI* – Monell *Violation for Inadequate Medical Care and Inadequate Conditions of Confinement*

Plaintiffs allege that Underwood, as the "decision and policy maker[] for the operations of LCDC," "knowingly and deliberately failed to implement or otherwise enforce policies and procedures to ensure constitutionally appropriate housing and adequate access to mental health and medical care for detainees/inmates at LCDC." [DE 4 at 67]. They also allege that Underwood "fail[ed] to operate the facility and properly train the staff to properly observe and care for and protect the inmates/detainees." [*Id.*]. Finally, they allege that Underwood was aware "that inmates/detainees were frequently denied access to adequate, timely, and appropriate medical care, . . . but failed to take steps to ensure that inmates/detainees at LCDC were adequately monitored and afforded access to timely and necessary medical care." [*Id.* at 68]. Plaintiffs therefore appear to rely on the second and third avenues of *Monell* liability—inadequate training or supervision and a custom of tolerance to violations.[11]

---

[11] To the extent that Plaintiffs argue that the practice of placing a jumpsuit right outside a detainee's cell constitutes "an illegal official policy or legislative enactment" such that Defendants should be liable under the first theory of liability, Plaintiffs fail to present evidence that that this was an official LaRue County policy or custom as opposed to an unofficial practice of the LCDC officers. *See Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) ("When proceeding under the first theory of *Monell* liability, under which a plaintiff must show an official policy or legislative enactment, the plaintiff must show that there were 'formal rules or understandings—*often but not always committed to writing*—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time.'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986))); *Sistrunk v. City of Hillview*, 545 F. Supp. 3d 493, 503 (W.D. Ky. 2021) ("[A] 'custom' exists only if it

### i.    Failure to Train or Supervise

To succeed on a failure to train or supervise claim, the plaintiff must prove that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Plaintiffs' claim under this theory fails because they have failed to show that LaRue County and/or Underwood were deliberately indifferent to the inadequacy of the training and supervision. For *Monell* purposes, a plaintiff can prove a municipality's deliberate indifference by showing either (1) "prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury," or (2) "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008).

As support for their contention that training was inadequate, Plaintiffs point to the following: (1) Duvall, a new floor deputy who was shadowing Huffines, had not yet completed training, including suicide training; (2) Underwood admitted that he relied on the training officer's opinion when deciding whether new officers should be placed on the floor; (3) Underwood's testimony suggested that he was uncertain about where officer training files were located; (4) Huffines testified that he "trained himself, online, while on duty at his desk" rather than receiving

---

carries 'the force of law'—that is, a pattern that is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010))); *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.").

formal instruction from a designated training officer; (5) information about Milby's mental state was inadequately communicated to subsequent shift staff; and (6) "Slayton admitted she 'didn't hit every log' for observations and left employment at LCDC one month after [Milby's] death." [DE 91 at 887–88]. Notably, however, Plaintiffs point to no prior instances of unconstitutional conduct that would suggest that Underwood or LaRue County ignored a history of abuse and were on notice that the training of officers was inadequate and likely to cause injury. Deliberate indifference "is a stringent standard of fault," and typically "requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005). Plaintiffs present no evidence that suicide prevention policies were routinely disregarded. Moreover, Grant, who had worked at LCDC for five years, testified that he had never been involved in another situation where an inmate had attempted suicide at LCDC, suggesting that Underwood was not on notice of past unconstitutional conduct. [DE 122 at 1841].

Because Plaintiffs do not provide evidence of previous instances of unconstitutional conduct resulting from inadequate training, they must rely on the second method of proving a municipality's deliberate indifference: "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Plinton*, 540 F.3d at 464. This mode of proof is available only "in a narrow range of circumstances where a federal rights violation may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018) (internal quotation marks omitted) (quoting *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015). In such a case,

27

> it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton*, 489 U.S. at 390. "Very few cases have upheld municipality liability for the suicide of a pre-trial detainee" under this theory. *Gray v. City of Detroit*, 399 F.3d 612, 618 (6th Cir. 2005). In fact, the Sixth Circuit has made clear that a municipality cannot be held liable where "there [is] no showing that the municipality's policymakers—as opposed to the individual officers directly involved in the inmate's suicide—ignored a known or apparent risk; while those policymakers may have been negligent, '[n]egligence does not establish a § 1983 claim.'" *Troutman*, 979 F.3d at 489 (quoting *Molton v. City of Cleveland*, 839 F.2d 240, 247 (6th Cir. 1988)). Here, there is no evidence that Underwood's conduct rose above mere negligence. Once again, as support for their contention that the County's inadequate training was the result of deliberate indifference, Plaintiffs point to Underwood's practice of relying on the training officer's opinions when deciding to place new officers on the floor and Underwood's uncertainty as to where officers' training files were located. [DE 91 at 887]. From this minimal evidence, the Court cannot conclude that Underwood/LaRue County ignored a known or apparent risk that their training procedures could result in a detainee committing suicide.

Moreover, Plaintiffs do not suggest that the LCDC policies themselves are deficient in any way. While Plaintiffs point to extensive evidence that Defendants Huffines and Skeeters were deliberately indifferent to the risk of Milby's suicide, that evidence is not relevant for purposes of establishing that the *county* was deliberately indifferent to the deficiency of their training and

28

supervision practices.[12] This exact issue was addressed by the Sixth Circuit in *Troutman v. Louisville Metro Department of Corrections*, where the plaintiff sought to hold the city liable for a detainee's suicide after jail officials placed him in solitary confinement despite a recent suicide attempt. 979 F.3d at 477. The court noted that Cox, the officer who put the detainee in solitary confinement, was deliberately indifferent, but that his liability did not support a finding of municipal liability, particularly where the municipality did have appropriate policies in place that were not followed. *Id.* at 490–91. Similarly, in *Perez v. Oakland County*, the plaintiff argued that placing the decedent in a single cell before his suicide "wholly disregarded jail policy," which required that potentially suicidal inmates be placed in a "multiple cell with appropriate supervision." 466 F.3d at 432. While the court found that the individual officer was arguably deliberately indifferent in his disregard of the risk of moving the decedent into solitary, it found that those same arguments counseled against finding the municipality liable. *Id.* "In other words, the arguments against the individual officer—that he failed to follow jail policy—itself implies the existence of a policy which, if followed adequately, would have prevented the suicide." *Troutman*, 979 F.3d at 490. Here, too, Plaintiffs argue that the other individual Defendants, such as Huffines and Skeeters, knew of—and consciously disregarded—LCDC policy, itself implying the existence

---

[12] Again, this evidence would be relevant if Plaintiffs had brought individual § 1983 suits against Huffines and Skeeters, but Plaintiffs *only* bring § 1983 claims against Underwood, and they maintain that those claims are official capacity claims. In their motion for summary judgment, Defendants alert Plaintiffs to their error: asserting a *Monell* claim against Underwood in his individual capacity even though *Monell* claims necessarily are brought against a government entity for an illegal policy or custom. In response, Plaintiffs maintain that the only constitutional causes of action they assert are two *Monell* claims against Underwood in his official capacity and that "the substance of Plaintiffs' claims clearly targets official policies and customs." [DE 91 at 912]. In other words, Plaintiffs stand by the two *Monell* causes of action asserted in their amended complaint and do not argue that they intended to bring any individual § 1983 claims against the individual Defendants, such as Huffines and Skeeters. Given that Plaintiffs *only* assert claims against LaRue County for a deprivation caused by an official county policy or custom, Plaintiffs' reliance on evidence that Huffines and Skeeters individually neglected to follow LCDC policies is largely unhelpful to their claims. If Plaintiffs intended to sue Huffines and Skeeters for § 1983 violations in their individual capacity, they could have asserted such in their response to the motion for summary judgment.

of a policy that, if followed, would have prevented Milby's suicide. While this disregard of LCDC policy could support an individual § 1983 claim against those Defendants, Plaintiffs have not brought such a claim.

In short, there is insufficient evidence in the record to establish that the alleged failure to train "reflects a 'deliberate' or 'conscious' choice by [the county]"—a requirement to establish a failure to train claim against a municipality. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Without any evidence of past constitutional violations or evidence that Underwood should have been aware of the deficiency of training policies, Plaintiffs cannot maintain a *Monell* claim for failure to train.

### ii.   Custom of Tolerance

To support an argument that the county had a custom of inaction, Plaintiffs would have to show:

> (1) "a clear and persistent" pattern of unconstitutional conduct by municipal employees; (2) the municipality's "notice or constructive notice" of the unconstitutional conduct; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the municipality rather than simply by the conduct of the municipal employee.

*D'Ambrosio*, 747 F.3d at 387–88. Once again, Plaintiffs have not shown that Underwood was on notice of past unconstitutional conduct. In opposing summary judgment, Plaintiffs point only to the circumstances surrounding this specific incident. Moreover, the Court is not aware of any evidence in the record of past constitutional violations by LCDC officers, and Underwood was not at the detention center on the day in question, so he was not aware of Huffines' and Skeeters' failures that day. Accordingly, Plaintiffs cannot succeed in showing deliberate indifference of

Underwood/LaRue County under the theory that they tolerated or acquiesced to unconstitutional conduct.

>    2.  *Count VII* – Monell *Violation for Failure to Train*

Count VII of Plaintiffs' complaint likewise attempts to rely on the third avenue to prove an illegal policy or custom of the County: the existence of a policy of inadequate training or supervision. Plaintiffs do not offer any different or additional evidence to support this Count beyond what was presented in the Court's discussion of Count VI above.[13] As the Court has already stated, Plaintiffs have failed to present sufficient evidence that Underwood/LaRue County had an official policy of inadequate training or that Underwood was deliberately indifferent to inadequate training. Without this, Plaintiffs' attempt to impose municipal liability on LaRue County, via Defendant Underwood in his official capacity, must fail.

The Court therefore grants Defendants' motion for summary judgment with respect to Counts VI and VII.

>    C.  State-Law Claims

Having dismissed Plaintiffs' federal law claims, the Court may decline to exercise supplemental jurisdiction over any remaining state-law claims. 28 U.S.C. § 1367(c)(3). "In determining whether to exercise supplemental jurisdiction, the district court should balance several factors, including judicial economy, convenience, fairness, and comity." *Williams v. Addison Cmty. Schs.*, 168 F.4th 791, 794–95 (6th Cir. 2026). Given that the parties have already extensively prepared for trial and filed their pre-trial memoranda, motions *in limine*, and witness and exhibit

---

[13] In their response, Plaintiffs do not separate their arguments with respect to Counts VI and VII, or any other Counts. Rather, they present an assortment of facts without explicitly explaining their relevance to any particular Count. Though it is unclear, the Court understands Plaintiffs to be arguing essentially the same theory of liability under Counts VI and VII: Underwood's failure to train or supervise as a result of deliberate indifference.

lists, the Court finds that exercising jurisdiction over the remaining state-law claims would be in the interest of judicial economy and fairness to the parties. Accordingly, the Court will consider Defendants' remaining arguments.

### 1. *Count I – Negligence*

Defendants move for summary judgment with respect to Plaintiffs' claims for negligence and negligence *per se* against Underwood, Huffines, Grant, Skeeters, and Slayton. [DE 8 at 511]. With respect to Underwood, Defendants argue that Underwood was not present at LCDC on the day of Milby's death, so he had no reason to believe that he might hurt himself. [*Id.*]. With respect to Grant, they argue that the record lacks evidence of Grant interacting with Milby on the day he took his life, except to escort him to make a phone call and to have a brief conversation with him. [*Id.*]. With respect to Slayton, Defendants argue that she was not present during Milby's death, and that Plaintiffs cannot connect any of her actions to Milby's death. [*Id.* at 511–12]. Finally, Defendants maintain that Huffines and Skeeters are entitled to qualified immunity. [*Id.* at 512]. Defendants do not address Bandy's liability for negligence or negligence *per se* in their motion for summary judgment other than to assert that they "do not understand why David Bandy is a party since he did not work either day [of Milby's detention]." [*Id.* at 499]. In response, Plaintiffs argue that there remains a genuine dispute of material fact and point to Defendants' various violations of LCDC policies that led to Milby's death.

To establish a claim of negligence, a plaintiff must show that the defendant owed the plaintiff a duty of care, that the defendant breached the standard by which his or her duty is measured, and that the plaintiff suffered injuries as a result. *City of Barbourville v. Hoskins*, 655 S.W.3d 137, 140–41 (Ky. 2022). Under Kentucky law, "if a jailer knows or has reason to believe that a prisoner might do harm to himself, he has a duty to exercise reasonable care to assure that

such harm does not occur." *Sudderth*, 621 S.W.2d at 35. "In determining whether a jailer's duty of reasonable care has been breached, the prisoner's mental state and physical condition must be taken into consideration." *Id.*

When sued in their individual capacities, "public officers and employees enjoy . . . qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified immunity applies to the negligent performance by a public officer of "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* (citation omitted). "An act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." *Id.* An officer is afforded no immunity, however, "for the negligent performance of a of a ministerial act simply because that act was a governmental function performed within the scope of the authority of the employee's office." *Id.* The Kentucky Supreme Court has laid out the distinction between discretionary and ministerial acts as follows:

> discretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed. On the other hand, ministerial acts or functions—for which there are no immunity—are those that require "only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.

*Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (citations omitted) (quoting *Yanero*, 65 S.W.3d at 522).

At the outset, the record establishes that neither Underwood nor Bandy were present during Milby's period of detention at LCDC. In Bandy's deposition, he stated that he was not working when Milby was brought in on February 11, 2022, nor was he working when Milby died on the afternoon of February 12, 2022. [DE 123, Bandy Dep., at 1858]. He therefore could not have had reason to believe that Milby might do harm to himself. Plaintiffs make no attempt to dispute this, and there is no other evidence in the record to suggest that Bandy had a duty to assure that Milby did not harm himself. Similarly, Underwood was not present at LCDC during Milby's detention and did not report to the jail until after he learned of Milby's death. [DE 121, Underwood Dep., at 1804]. He, like Bandy, could not have had reason to believe that Milby would harm himself and therefore did not have a duty to prevent such harm. There is therefore no dispute of material fact with respect to whether Bandy and Underwood were negligent. Accordingly, the Court will grant summary judgment on the negligence claim with respect to Bandy and Underwood.

Next, the record establishes that Slayton also was not present at the time of Milby's death because her shift had ended. Slayton was on duty the night that Milby was brought to LCDC, and she was responsible for conducting his intake. [DE 117, Slayton Dep., at 1671–72]. She therefore had reason to believe that Milby might harm himself and had a duty to exercise reasonable care to ensure that such harm did not occur. The record establishes that Slayton did exercise such reasonable care during her shift. During booking, she asked Milby the required intake questions and learned that he had attempted suicide in the past six months. [*Id.* at 1673–74]. During her deposition, she confirmed that Milby's status was then reported to the nurse and that Milby was placed in an anti-suicide smock immediately upon booking. [*Id.*]. She also stated that she relayed the information about Milby's suicide risk to the officers taking over for the next shift. [*Id.* at 1673]. Finally, she stated that, when she performed rounds, she would "holler for [Milby] to get

34

him to move and make a sound" and that she talked to Milby just before she left when her shift ended. [*Id.* at 1677]. In *Sudderth v. White*, the Kentucky Court of Appeals held that a deputy jailer who was off duty at the time of the detainee's suicide could not be guilty of negligence because "his responsibility ended when he went off duty, and the cause of death [was] attributable, if at all, to superseding negligence on the part of others." 621 S.W.2d at 36. Here, too, the record establishes that Slayton fulfilled her duty during her shift, and that her duty ended at the end of her shift. Plaintiffs present no evidence to suggest that Slayton's duty to Milby continued after her shift ended or that she engaged in some breach of duty during her shift that caused Milby's subsequent suicide. Accordingly, there is no genuine dispute of material fact and Slayton is entitled to judgment as a matter of law.

Defendants argue that Grant is entitled to summary judgment because "the record is void [sic] of [Grant] interacting with Milby on the date he took his life, except to escort him to make a phone call to his and a brief conversation with him." [DE 84 at 511]. The fact that Grant had limited contact with Milby does not, however, automatically rid him of any duty to prevent harm. Rather, the question is whether Grant knew or had reason to believe that Milby might harm himself. *See Sudderth*, 621 S.W.2d at 35. The record establishes that Grant had a conversation with Milby in which Milby was "very verbally suicidal" and "talking about wanting to end his life," making Grant aware of Milby's mental state. [DE 122, Grant Dep., at 1836].

However, the record also establishes that Grant was assigned to work the work the "state side" of LCDC on the day of Milby's death, while Huffines was responsible for monitoring inmates on the "county side," where Milby was located. [*Id.* at 1835]. Grant stated that he was only present on the county side occasionally to check on Huffines and "help him if he needed it." [*Id.*]. Huffines stated in his deposition that officers would sometimes leave their assigned "side" to assist officers

35

on the other side. [DE 120-1, Huffines Dep, at 1773]. For instance, he noted that "if something happens, like we assist each other passing trays, we assist each other if there's an altercation. If there's a problem then I'm going to go help [Grant]." [*Id.*]. Grant's decision to assist Huffines on the county side has all the hallmarks of a discretionary act, entitling him to qualified immunity. Unlike ministerial acts, Grant's decision to check on and assist with the county side was just that— a decision. His duty to check was not "absolute, certain, and imperative." *Yanero*, 65 S.W.3d at 510. Rather, his acts necessarily required "discretion in determining how or whether the act shall be done." *Haney*, 311 S.W.3d at 240. Huffines was responsible for monitoring Milby, and Grant's assistance was purely discretionary. Because of this, Grant is immune from the negligence claim unless it is shown that he committed the act in bad faith. *See Burnette v. Gee*, 137 F. App'x 806, 812–13 (6th Cir. 2005) (citing *Yanero*, 65 S.W.3d at 523) ("Under Kentucky law, [government] officers are immune to negligence claims for their discretionary acts, unless it is shown that the officers committed the act in bad faith."). Plaintiffs present no evidence that Grant acted in bad faith, and the Court not aware of any such evidence in the record. Accordingly, Grant is entitled to qualified immunity, the Court will grant him summary judgment with respect to Plaintiffs' negligence claim.

Huffines, like Grant, had reason to believe that Milby might harm himself. He was aware that Milby had been given an anti-suicide smock, that he was placed on suicide watch, and that he was placed in a special cell for observation.  [DE 120, Huffines Dep., at 1764]. Huffines also knew that, pursuant to LCDC policy VI-100, he was required to check on inmates on suicide watch every fifteen minutes. [*Id.*; DE 83-8, Carter Report., at 409]. Huffines therefore had a duty to exercise reasonable care to prevent Milby from harming himself, and it is unclear from the record whether he exercised such care. As laid out above, surveillance footage reveals that Huffines logged

36

observations of Milby without physically looking at Milby's cell and that he logged observations after Milby had already hung himself, suggesting that he failed to comply with his duty. This was contrary to LCDC policy, which requires officers to "document direct in-person surveillance a minimum of every Fifteen (15) minutes" for high-risk inmates. [DE 83-8, Carter Report, at 409]. Moreover, Huffines was required to perform these observations, making them ministerial as opposed to discretionary. *See Williams v. Kentucky Dep't of Educ.*, 113 S.W.3d 145, 150 (Ky. 2003) (finding that teacher's duty to supervise students was a ministerial function because it was required by the Board of Education Code of Conduct). Accordingly, Huffines cannot rely on qualified immunity to escape liability.

Defendants maintain that "Milby was purposefully showing himself to Huffines so that Huffines could do his physical check of Milby without knowledge that Milby had the jumpsuit in his cell" and that Huffines "physically saw Milby at every single check." [DE 132 at 2014]. This is far from obvious in the surveillance footage, which reveals that Huffines made cursory glances toward Milby's cell and at various times logged observations without looking at the cell. It is not apparent from these glances that Huffines saw Milby, so a jury could reasonably conclude that Huffines failed to comply with LCDC observation policies for high-risk inmates. The Court will therefore deny summary judgment with respect Plaintiffs' negligence claim against Huffines.

Finally, Skeeters was also aware that Milby was on suicide watch, imposing on her a duty to exercise reasonable care to prevent him from harming himself. [DE 119, Skeeters Dep., at 1730]. Though Skeeters was tasked with monitoring the surveillance camera positioned in Milby's cell, she failed to observe the long stretches of time in which Milby was not visible on camera or the various instances he can be seen on camera holding the jumpsuit or constructing a noose with the jumpsuit. Bandy, another control room operator, stated in his deposition that control room workers

37

are trained to "always watch the camera" for inmates on suicide watch and to call a deputy to check the cell if the inmate is not visible on camera. [DE 123, Bandy Dep., at 1860]. Defendants argue that Skeeters is entitled to qualified immunity. [DE 84 at 512]. However, they fail to point to any evidence that Skeeters' duty to monitor the camera in Milby's cell was discretionary as opposed to ministerial. Rather, evidence in the record suggests that this was an essential part of her job duties. Accordingly, the Court will deny summary judgment with respect Plaintiffs' negligence claim against Skeeters.

The Court therefore grants Defendants' motion for summary judgment on Plaintiffs' negligence claim with respect to Underwood, Bandy, Slayton, and Grant. The Court denies Defendants' motion for summary judgment with respect to Huffines and Skeeters.

### 2. *Count II – Negligence* Per Se

Defendants argue that they are entitled to summary judgment on Plaintiffs' negligence *per se* claim for the same reasons they are entitled to summary judgment on the negligence claim. [DE 84 at 511–12]. They also maintain that 501 KAR 3:060, which Plaintiffs reference as the basis for this claim, does not establish a standard of care and therefore "cannot be the predicate for a negligence per se claim." [DE 84 at 512]. Plaintiffs do not directly respond to this argument. They maintain, however, that "501 KAR 3:060 Section 2 mandates direct in-person surveillance every 20 minutes for inmates at risk of suicide [and that] LCDC's own Policy VI-100 imposed an even more stringent requirement." [DE 91 at 893–94]. They also point to 501 KAR 3:090, which, according to Plaintiffs, requires that "any inmate who is under observation due to suicidal tendencies, shall have the following items removed from his cell: A, items which he or she could hang himself/herself," and LCDC Policy VIII-600, which requires removal of "items with which [an inmate] could hang himself/herself (i.e., belts, shoelaces, sheets, towels, etc.)." [*Id.* at 894].

38

Finally, Plaintiffs point to 501 KAR 3:070, which they claim "requires that 'inmates who have attempted suicide will be referred to local mental health agency.'" [*Id.* at 907].

At the outset, the Court notes that Plaintiffs misstate the source of some of these requirements. For instance, the requirement that "inmates who have attempted suicide will be referred to local mental health agency" is found in LCDC policy VII-800, not the Kentucky Administrative Regulations. [DE 149-1 at 2490]. That policy states that it is simply based on 501 KAR 3:070, which requires that jails create "written policy and procedures for emergency situations including . . . suicide." 501 KAR 3:070(2)(g). Similarly, 501 KAR 3:090 simply requires that "[e]ach jail shall have a written policy and procedure outlining jail personnel response to detainees who are at risk for suicide or have attempted or completed suicide." 501 KAR 3:090(12). Deposition testimony from Murray suggests that the language "any inmate who is under observation due to suicidal tendencies, shall have the following items removed from his cell: A, items which he or she could hang himself/herself" is found in LCDC policies made pursuant to 501 KAR 3:090's directive. [DE 116, Murray Dep., at 1603]. Only 501 KAR 3:060 states what Plaintiffs claim it states—that jail personnel must "conduct and document direct in-person surveillance on an irregular schedule, at least every twenty (20) minutes" for suicidal inmates. 501 KAR 3:060 Section 2(1).

Under Kentucky law, only statutes and regulations can serve as the basis for a negligence *per se* claim. *See Flechsig v. United States*, 991 F.2d 300, 304 (6th Cir. 1993) (explaining that, under Kentucky law, violations of statutes or public safety regulations may form the basis of a negligence *per se* claim, but that internal operating procedures could not). Accordingly, of the regulations and policies that Plaintiffs mention, only 501 KAR 3:060 can form the basis of a

39

negligence *per se* claim. Moreover, only Huffines could possibly have violated this statute because he was the only one tasked with conducting in-person surveillance on an inmate on suicide watch.

"The doctrine of negligence per se allows a court to determine a standard of conduct by reference to a statute." *Vanhook v. Somerset Health Facilities*, LP, 67 F. Supp. 3d 810, 817 (E.D. Ky. 2014). Negligence *per se* "is merely a negligence claim with a statutory standard of care substituted for the common law standard of care." *Young v. Carran*, 289 S.W.3d 586, 588–89 (Ky. App. 2009) (quoting *Real Est. Marketing, Inc. v. Franz*, 885 S.W.2d 921, 926–27 (Ky. 1994), *overruled on other grounds by Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729 (Ky. 2011)). KRS § 446.070, which codifies the common law negligence *per se* rule, provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation[.]" KRS § 446.070. To state a negligence *per se* claim, a plaintiff must show that (1) the statute in question is penal in nature or provides no civil remedy; (2) the party is within the class of persons the statute is intended to protect and (3) the plaintiff's injury is the type that the statute was designed to prevent. *Vanhook¸*67 F. Supp. 3d at 817.

Here, 501 KAR 3:060 provides no civil remedy for a violation, and the regulation is designed to prevent inmates from committing suicide while detained. Accordingly, Milby was in the class of persons the regulation is designed to protect, and he suffered the kind of injury the regulation is designed to prevent. Defendants' claim that 501 KAR 3:060 does not establish a standard of care is without merit, given that the regulation explicitly provides that jail personnel must conduct surveillance every twenty minutes. The only remaining question is whether there is a genuine dispute of material fact with respect to Huffines' failure to comply with this standard. Camera 10 footage reveals that Huffines glanced toward Milby's cell at 15:46:47 and did not directly look at Milby's cell again until 16:06:54. This footage creates a dispute of fact with respect

40

to whether Huffines' glances constituted "direct in-person surveillance" and whether such surveillance occurred every twenty minutes as required by 501 KAR 3:060. Defendants attempt to characterize every glance Huffines made toward Milby's cell as an act of surveillance, but it is unclear from evidence in the record whether Huffines actually saw Milby on each of these occasions.

There is also a dispute of fact about whether Huffines' failure to comply with the regulation was the proximate cause of Milby's death, given that Huffines' apparent lack of surveillance gave Milby time to retrieve the jumpsuit and form a noose. While "[c]ourts have long been . . . reluctant to recognize suicide as a proximate consequence of a defendant's wrongful act," there is an exception when "a person known to be suicidal is placed in the direct care of a jailer or other custodian . . . and the custodian negligently fails to take appropriate measures to guard against the person's killing himself." *Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir. 1990); *see also Patton v. Bickford*, 529 S.W.3d 717, 732 (Ky. 2016) ("[T]he general rule regarding suicide as a superseding intervening event does not apply to conduct that, by negligence or intent, foreseeably induces a suicidal reaction."). Moreover, Kentucky courts have recognized that "a tortfeasor may be held liable for the suicide of a person that is the result of a tortfeasor's negligent conduct provided the suicide is a *foreseeable consequence* of the tortfeasor's acts." *Patton v. Bickford*, 529 S.W.3d 717, 732 (Ky. 2016) (quoting 22A Am. Jur. 2d Death § 41 (2017)). Defendants argue that "Milby's purposeful actions to conceal the suicide made the suicide unforeseeable and a superseding intervening cause," but the record lacks direct evidence of their contention that Milby took steps to conceal the jumpsuit. Given that Milby was known to have suicidal tendencies and was "very verbally suicidal" according to Grant, his suicide was a foreseeable consequence of failing to perform required checks.

41

Accordingly, with respect to Plaintiffs' negligence *per se* claim, the Court grants summary judgment as to Defendants Underwood, Grant, Skeeters, Slayton, and Bandy. The Court denies summary judgment as to Huffines.

### 3. Count III – Assault and Battery

Defendants indicate in their motion for summary judgment that this cause of action is dismissed by agreement of the parties. [DE 84 at 511 n.23]. Accordingly, neither Defendants nor Plaintiffs make any arguments with respect to this claim. However, the Court is not aware of any agreed notice of dismissal filed by the parties, and Defendants have not moved for summary judgment with respect to this claim. Accordingly, the Court will not dismiss Count III at this time.

### 4. Counts IV and V – Wrongful Death and Loss of Parental Consortium

Defendants once again argue that Underwood, Grant, Slayton, and Bandy are entitled to summary judgment for wrongful death and loss of parental consortium because they were either not present at the time of Milby's suicide or not responsible for his oversight. [DE 84 at 499, 513]. With respect to Huffines and Skeeters, they once again argue that they are entitled to qualified immunity. [*Id.*]. Defendants maintain that, because "they are entitled to qualified immunity and/or Plaintiffs cannot prove negligence or negligence per se as a matter of law," Plaintiffs' claim of wrongful death must fail, because such claims require proof of negligence. [DE 132 at 2015]. As a result, they argue that the loss of parental consortium claim must also fail because such claims are limited to those involving the wrongful death of a parent. [*Id.*]. In other words, wrongful death claims require proof of negligence, and loss of parental consortium class require proof of wrongful death. *See DeLong's Adm'r v. Tackett*, 240 S.W.2d 829, 831 (Ky. 1951) ("[I]t is also necessary to show that the wrongful death was caused and brought about as the proximate result of the negligence or wrongful act of defendant. Otherwise, there would be an imposition of liability

42

without fault."); *Owens v. Glob. Equip. Co.*, Inc., No. 1:17-CV-00182-GNS, 2018 WL 3186980, at *1 (W.D. Ky. June 28, 2018) ("Kentucky law is clear that loss of parental consortium claims are only recoverable in conjunction with wrongful death actions."). Because the Court has denied summary judgment on the negligence claim with respect to Huffines and Skeeters and the negligence *per se* claim with respect to Huffines, Defendants' argument fails as to those Huffines and Skeeters. With respect to Underwood, Grant, Slayton, and Bandy, however, the Court finds that summary judgment is proper because the Court's dismissal of the negligence claims against them precludes wrongful death, and therefore, loss of parental consortium. *See* KRS 411.130(1) ("Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it.").

The Court therefore grants summary judgment on Plaintiffs' wrongful death and loss of parental consortium claims as to Defendants Underwood, Bandy, Grant, and Slayton. The Court denies summary judgment as to Huffines and Skeeters.

## IV.    CONCLUSION

For the reasons above, the Court **ORDERS** as follow:

(1) Defendants' motion to exclude expert testimony [DE 82] is **DENIED**.

(2) Defendants' motion for summary judgment [DE 83] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Court: (1) **GRANTS** summary judgment to Underwood, Bandy, Grant, and Slayton on Counts I, IV, and V; (2) **GRANTS** summary judgment to Underwood, Bandy, Slayton, Grant, and Skeeters on Count II; (3) **GRANTS** summary judgment on Counts VI and VII; (4) **DENIES** summary judgment with respect

to Counts I, II, IV, and V against Huffines; and (5) **DENIES** summary judgment with respect to Counts I, IV, and V against Skeeters.

(3) Defendants Duvall's motion for summary judgment [DE 85] and WKCH's motion for summary judgment [DE 86] are **DENIED AS MOOT**.